**Darel L. NELSON, Plaintiff,**

v.

**PULASKI COUNTY SHERIFF'S DE-PARTMENT and Carroll Gravett, Sheriff, in his official capacity and individual capacity, Defendants.**

No. LR–C–93–201.

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 12, 1994.

Darrell F. Brown, Little Rock, AR, for plaintiff.

David M. Fuqua, North Little Rock, AR, Nelwyn L. Davis, Pulaski County Attorney's Office, Little Rock, AR, for defendant.

## ORDER

ROY, District Judge.

Plaintiff has brought his employment related race discrimination case pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. More specifically, he alleges that he was not hired for a position with the Pulaski County Sheriff's Department because of his race. He properly first sought and obtained a notice of right to sue letter from the Equal Employment Opportunity Commission dated December 24, 1992.

The Court presided over a bench trial during which Mr. Nelson's case was presented. After having examined all the evidence put on at trial, together with the several pleadings submitted by the parties, including post trial briefs, the Court now makes its findings of fact and conclusions of law.[1]

## I.

Mr. Darel Nelson, an adult black male, applied for employment with the sheriff's department on or about November 27, 1989. Earlier that year the department had been directed by court order (in an unrelated lawsuit) to bunk a larger number of prisoners at the county jail (the "double bunk order"). This necessitated the hiring of ten new jailers. The Department then directed the county personnel office to advertise these new openings. It was for one of these jailer positions, and also for a separate investigator position, that plaintiff applied.[2]

After the personnel office checked the applications for minimum qualifications, several dozen, including the plaintiff's, were forwarded to the sheriff's department. Sheriff Gravett had delegated to Captain James White, the Jail Administrator, full authority to screen and interview the applicants. White's tentative selections were to be then forwarded to the Sheriff for final official approval and hiring.

Captain White testified that when determining which applicants would be selected for interviews and further processing, he would consider the applicant's education, training, job history, job stability, military service, his own personal knowledge of the applicant, if any, and the applicant's references. White would examine the applications and, applying those criteria, "red flag" any portion of an application which gave him concern that the applicant might not be suitable for the position applied for. Those applications would then be set aside.

1. At the parties' request, the Court has withheld ruling on this matter until the case of *Welch v. Liberty Machine Works, Inc.*, 23 F.3d 1403 (8th Cir.1994) was decided by the Court of Appeals.

2. The application "packet" which plaintiff completed consisted of the basic application form, a questionnaire for the correctional officer position, and a questionnaire for the investigator

If the remaining applications were of sufficient number to provide a suitably large pool of applicants for further processing, then the flagged applications would receive no further consideration. On the other hand, if the resulting "clean" pool was deemed too small, then flagged applications could be considered again.

Those whose applications were not flagged were granted interviews. Those not rejected after the interview were given a psychological examination, a physical examination, and subjected to a background investigation by an officer with the Department. Those remaining after passing through these additional filters had their names submitted to the Sheriff who would then make the final decision as to hiring.

The plaintiff was not hired by the Department, nor was he selected for an interview. Five of the ten people eventually hired to satisfy the new requirements caused by the "double-bunking" order had already applied and interviewed prior to the plaintiff's application on November 27, 1989. The earliest hire date was January 4, 1990. All five were white. Five additional hires were made; all of them were also white. In other words, all ten of the new jailers hired were white.[3]

Captain White testified that he flagged the plaintiff's application for three reasons. First, he was suspicious that the applicant was not being truthful when he stated he had received an "honorable" discharge from the Navy after only serving two years. Second,

the application indicated plaintiff left the Arkansas Department of Corrections to "relocate," yet showed his next employment to be in Little Rock, which would have required no relocation (the plaintiff was living in Little Rock at the time). Third, Captain White perceived a propensity on the part of the applicant to change jobs frequently.

## II.

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

It shall be an unlawful employment practice for an employer—

"(1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...."

42 U.S.C. § 2000e–2(a).

An allocation of the burden of production and an order for the presentation of proof in Title VII discrimination cases was established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). "The plaintiff in such a case ... must first establish, by a preponderance of the evidence, a 'prima facie' case of racial discrimination." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993).

position. All three items were stapled together in one packet.

**3.** The ten hired are listed below (from defendant's Ex. 1A):

| NAME | DATE APPLIED | DATE INTERVIEWED | DATE HIRED |
|------|------|------|------|
| Calhoun, T. | 5/24/89 | 11/09/89 | Jan. 04, 1990 |
| Evans, K. | 10/11/89 | 11/14/89 | " |
| Felker, S. | 5/22/89 | 10/29/89 | " |
| Leggat, M. | 11/03/89 | 11/29/89 | " |
| Mates, S. | 10/30/89 | 11/14/89 | " |
| Miller, R. | 6/23/89 | 11/13/89 | Jan. 05, 1990 |
| Godwin, J.* | ? | — | Jan. 30, 1990 |
| Lake, J. | 11/08/89 | 12/15/89 | Jan. 31, 1990 |
| Vest, D.C. | 12/28/89 | 1/16/90 | Feb. 02, 1990 |
| Bond, R. | 12/04/89 | 1/09/90 | Feb. 14, 1990 |

* Godwin was serving, or had been serving, as an auxiliary deputy at the time he was hired as one of the new correctional officers.

Once accomplished, the defendant then has "the burden of producing an explanation to rebut the prima facie case—*i.e.,* the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Id.* at ——, 113 S.Ct. at 2747 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)).

If the defendant is successful, the plaintiff then has the "'ultimate burden of persuading the trier of fact'" "'that the proffered reason was not the true reason for the employment decision' and that race was." —— U.S. ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095).

### A. Plaintiff's prima facie case.

■ The Court first considers whether the plaintiff in this case, Mr. Nelson, has met his initial burden of establishing a *prima facie* case. To make out a *prima facie* claim of disparate treatment in a job application scenario, a plaintiff must show:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. 411 U.S., at 802 [93 S.Ct., at 1824].

*Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), quoting *McDonnell Douglas, supra.*

Of course, there is no dispute that the plaintiff is black and that he was not hired, thus satisfying the first and third elements. Thus, the Court will first consider whether the plaintiff "was qualified for a job for which the employer was seeking applicants."

As stated above, Captain White testified that he considered an applicant's education, training, job history, job stability, military service, his personal knowledge of the applicant, if any, and the applicant's references.

Mr. Nelson's application indicated, among other things, a high school diploma and 116 hours earned toward a college degree in physical education,[4] two years of service, with honorable discharge, with the United States Navy, previous employment and training with the Arkansas Department of Corrections, and two references who were employed by the Sheriff's Department. The Court finds that the plaintiff was qualified for the position for which he applied.

The final element of plaintiff's *prima facie* case is showing that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. An examination of the applications of the people eventually hired indicate that plaintiff's listed qualifications were (at least) in keeping with those of the hirees. Two of the ten hired applied after the plaintiff did. At least four were interviewed after the plaintiff applied. All were hired after the plaintiff applied. Thus, the fourth requirement has been met as well.

Therefore, the Court concludes that the plaintiff has made his *prima facie* case of racial discrimination.

### B. Defendant's rebuttal.

■ Since the plaintiff has made his *prima facie* case, the defendant now has the burden of "producing evidence" that the adverse employment actions were taken:

"for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S., at 254 [101 S.Ct., at 1094]. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action.

*St. Mary's Honor Center v. Hicks,* —— U.S., at ——, 113 S.Ct., at 2747, quoting *Burdine,* 450 U.S., at 254–55, and n. 8, 101 S.Ct., at 1094, and n. 8.

As mentioned briefly above, Captain White flagged Mr. Nelson's application, thereby ul-

---

**4.** White testified that when he reviewed plaintiff's application, he actually thought that plaintiff had already received his degree.

timately disqualifying him from getting an interview, for three reasons: the nature of his military discharge, his stated reason for leaving his job with the Department of Corrections, and the frequency with which he changed jobs.

The Captain was suspicious that the applicant was lying about the "honorable" nature of his discharge from the Navy because Mr. Nelson had also indicated that he was in the service only 23½ months. Captain White had served 20 years in the military himself and testified that he did not believe it possible that someone could receive an honorable discharge after serving less than two years of a four year "hitch." He surmised, erroneously, that the applicant was discharged early as part of a disciplinary measure.

As it so happened, Mr. Nelson was discharged early, but honorably, from the Navy for medical reasons, and produced at trial his Department of Defense Form 214 to prove it. However, Captain White was not privy to this explanatory information at the time he made his decision because it was not on the application form.

The second "flag" related to Mr. Nelson's explanation for leaving the Department of Corrections, i.e., to "relocate." The Captain noted that from November 1988 to June 1989, plaintiff was employed as a guard at the Wrightsville prison, which is about eight miles south of the Little Rock city limits, and that he resigned because he "relocated."

The application also indicated that plaintiff's next job was with the Little Rock Boys Club from June to August of 1989. Because of the close proximity of the job sites, the explanation of relocation made no sense to Captain White. He surmised that the applicant had left the prison job under poor circumstances and was lying about his reason for leaving.

However, once again the Captain's suspicions proved false. At trial it was discovered that Mr. Nelson, while working at Wrightsville, was invited to come to Dallas, Texas to try out with the Dallas Cowboys. Unfortunately, his association with professional football lasted less than one month and he returned to Little Rock to a summer job with

the Boys Club in late June. Thus, Mr. Nelson really did leave his job in order to relocate, but (again) none of this helpful explanatory information was before Captain White when he was evaluating Mr. Nelson's application.

Finally, there is the Captain's subjective observation that the applicant changed jobs too frequently. He read on the application that the plaintiff left the Navy after less than two years, he left the DOC after seven months, and then took a "summer only" job for three months. Captain testified that he thought this might indicate a lack of dedication or commitment on the part of the applicant.

The Court finds that the defense has articulated "legitimate, nondiscriminatory reasons" for its failure to grant the plaintiff an interview.

*C. Plaintiff's final burden.*

The Court having found that the defendants have sustained their burden of production by introducing evidence of three legitimate, nondiscriminatory reasons for their actions:

> "the presumption raised by the prima facie case is rebutted," and "drops from the case." The plaintiff then has "the full and fair opportunity to demonstrate," through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," *and that race was.* He retains that "ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination."

*St. Mary's Honor Center v. Hicks,* —— U.S. at —— – ——, 113 S.Ct., at 2747–48, (emphasis added), quoting *Burdine,* 450 U.S., at 255, at 255, n. 10, and at 256, 101 S.Ct., at 1094–95, at 1095, n. 10, and at 1095. The Eighth Circuit recently put it more simply: "the three-part analysis [now] drops from the case, and the district court must only decide whether the employer intentionally discriminated ... against the [prospective] employee. *Maness v. Star–Kist Foods,* 7 F.3d 704, 707 (8th Cir.1993) (following *St. Mary's Honor Center v. Hicks* ).

The plaintiff argues that the defendants' proffered reasons are pretextual and that he was intentionally denied an interview, and thereby employment, because he is black. He also argues that the Captain did not follow his own stated evaluation criteria because the plaintiff's "education was superior to all the other applicants that he was compared to" and because the Captain did not contact plaintiff's references (two of whom worked for the Sheriff's Department) though he did contact other applicants' references.

■ A finding that the defendants' proffered reasons are pretextual "will *permit* the trier of fact to infer the ultimate fact of intentional discrimination," but it does not *require* such a finding. *Hicks,* —— U.S. at ——, 113 S.Ct., at 2749 (emphasis in original). The pretext found must be for *discrimination.* "[A] reason cannot be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Id.,* at ——, 113 S.Ct. at 2752.

■ The plaintiff has at least two significant factual problems to overcome in order to convince the Court that defendants intentionally discriminated against him on account of race. One is his difficulty in proving that the Captain *even knew that the applicant was black.* This has been found to be a necessary prerequisite in other "failure to interview" cases. "An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race." *Robinson v. Adams,* 847 F.2d 1315, 1316 (9th Cir.1987) (*affirming the district court's granting summary judgment in favor of defendant* ).

The application the plaintiff filled out does not ask an applicant his race. However, the plaintiff argues that Captain White almost certainly would have inferred (and should be deemed as having inferred) that the plaintiff was black for two reasons: his own address and the people he put down for references. More specifically, plaintiff's application shows his address to be in the College Station community, an area acknowledged to be almost totally black. However, the Captain testified he did not notice the applicant's address so it played no part in his decision to flag Mr. Nelson's application.

Second, the Captain admitted that he knew that two of Mr. Nelson's references were black employees of the Sheriff's Department, but also testified he did not know the third reference listed. The plaintiff contends that a person in Captain White's position should be familiar with the county's various neighborhoods, including the ones which might be described as "racially identifiable," and that he should have known from the address that the third reference also lived in a black neighborhood.

The Court is reluctant to find that Captain White "knew" that the applicant was black based on nothing more than what is stated above. After all, there was no evidence presented that the Captain knew or had ever met the applicant or had even heard of him. And of course, the plaintiff never got to interview with Captain White.

Nevertheless, even if one assumes for the sake of argument that the Captain knew that the applicant was black, plaintiff still has the burden of proving that the Captain failed to grant him an interview *because* he was black. Plaintiff did not suggest any motive to explain why the Captain would deny him an interview *simply* because he is black, did not point to any untoward statements rumored to have been made by the Captain or his boss, the sheriff, or allege that this was part of a pattern of conduct by the Department not to hire blacks.

Instead, plaintiff simply depends on his excellent qualifications for the job, relative to those of the people selected for interviews, together with the fact that out of the ten new jailers hired in response to the double bunking order, the number of blacks hired was none. Had those ten slots been the only ones filled by the Department, with no other evidence of the hiring practices of the Department and Captain White put before the Court, this Court might have inferred that the defendants must have failed to interview him because he is a black man. However, other evidence of the Department's hiring records with regard to blacks is in the record.

The notice of November 27, 1989, to which the plaintiff responded was one of several published by the County for new jailers. In other words, the Sheriff's Department frequently advertised for new jailers.[5]

Among the statistical information presented to the Court was a table, the accuracy of which was not questioned, which identified by name, hire date, race, and sex the 113 "Persons Hired For Jail" from May 1, 1985 through May 30, 1992. It was never revealed how many of the 113 were hired as "correctional officers."[6] An analysis of the data reveals the following:

★ During that 85 month period, 23 of the 113 people hired for the jail were black, which is 20.4%.[7]

★ During the period after plaintiff presented his application until Captain White ended his tenure as Jail Administrator, from December 1, 1989 until May 30, 1992, six of the 42 people hired (14.3%) were black.

★ A total of 74 applications were received in response to the job notice dated November 27, 1989. From that group, a total of eight people were hired for positions with the jail; two were black.

These figures indicate that the number of blacks hired by the Captain during his tenure at the jail were representative of the portion of blacks living in the county. Furthermore, there was no evidence presented to support a proposition that blacks were mainly hired for low end, lower paying jobs, nor did plaintiff even make that suggestion. In short, the statistical evidence presented does not support plaintiff's assertion that Captain White and the named defendants did not want to hire black jailers; if anything, it points to the contrary.

It is the finding of this Court, after considering all the evidence presented, that the plaintiff has not met his burden of proving that the reason he was not selected for an interview was because he is black. Judgment therefore shall be for the defendants.

## III.

Having made the findings necessary to decide this case, the Court would like to add two final points. In their post-trial brief, the defendants argue in the alternative that even if the plaintiff had sufficiently met his burden of proving that he was not interviewed for discriminatory reasons, they should still prevail because the plaintiff materially misrepresented facts on his application and that such misrepresentations, even if only discovered long after the hire date, can constitute a defense in Title VII actions. *Welch v. Liberty Machine Works, Inc.*, 23 F.3d 1403 (8th Cir.1994) ("after-acquired evidence of employee misrepresentation bars recovery for an unlawful discharge, if the employer establishes that it would not have hired the employee had it known of the misrepresentation").

The Court finds that *Welch* does not apply simply because Mr. Nelson, contrary to the assertions of the defendants, did not misrepresent either his college education or his military discharge.

Finally, the Court's finding that the defendants were not guilty of discriminatory conduct should not be taken as an endorsement of their hiring practices. The Court realizes that evaluating job applications is an inexact science at best and necessarily involves making subjective judgments. However, the defendants have done little to reduce the subjectivity which is inherent to the process. The Court suggests the manner of selecting applicants should be done under more objective standards and such should be promulgated.

---

5. For example, advertisements for "correctional officers" appeared on May 19, 1989 (this may be the one eventual hirees Calhoun, Felker, and Miller responded to), November 27, 1989 (the one Mr. Nelson answered), January 30, 1990, February 21, 1990, and February 26, 1990. The February ads appeared after the ten "double bunk order" jailers had been hired. Those ads were a response to additional hiring needs experienced by the Sheriff's Department.

6. Furthermore, some of the ads described more than one position with the county and/or the jail. Some applicants do as the plaintiff did and apply for more than one position at a time. Some may apply for one position and get hired for another.

7. This does not include one other minority member hired who is not black.

Nevertheless, because of the plaintiff's failure to prove that he was refused an interview on account of race, judgment shall be for the defendants.

IT IS SO ORDERED.